13:12:40

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
ALMONDNET, INC., and          )
INTENT IQ, LLC,               )
                              )
          Plaintiffs,         )
                              ) C.A. No. 24-831(MN)
v.                            ) C.A. No. 24-1296(MN)
                              )
LIVEINTENT, INC.,             )
CONNATIX NATIVE EXCHANGE, INC.,)
                              )
          Defendants.         )
```

Friday, July 11, 2025
10:08 a.m.
Motion Hearing


844 King Street
Wilmington, Delaware


BEFORE:  THE HONORABLE MARYELLEN NOREIKA
         United States District Court Judge



APPEARANCES:


         FARNAN LLP
         BY:  MICHAEL J. FARNAN, ESQ.

         -and-

         RUSS AUGUST KABAT
         BY:  JOSHUA SCHEUFLER, ESQ.


                    Counsel for the Plaintiffs

1    APPEARANCES CONTINUED:

2
                    FISH & RICHARDSON P.C.
3                   BY:  GRAYSON P. SUNDERMEIR, ESQ.
                    BY:  SUSAN E. MORRISON, ESQ.
4
                        Counsel for the Defendants
5

6                    – – – – – – – – – – – – – –

7

8                    COURTROOM DEPUTY:  All rise.  The United States

9    District Court for the District of Delaware is now in

10:08:52 10    session.  The Honorable Maryellen Noreika presiding.

10:08:52 11                    THE COURT:  All right.  Good morning, everyone.

10:08:54 12    Please be seated.

10:08:56 13                    Who do we have, Mr. Farnan?

10:08:58 14                    MR. FARNAN:  Good morning, Your Honor.  Michael

10:09:01 15    Farnan for the plaintiff.  With me today is Josh Scheufler

10:09:05 16    from Russ August & Kabat.

10:09:07 17                    THE COURT:  All right.

10:09:10 18                    For the defendants?

10:09:11 19                    MS. MORRISON:  Good morning, Your Honor.  Susan

10:09:13 20    Morrison from Fish & Richardson on behalf of both

10:09:15 21    defendants.  And with me is my partner, Grayson Sundermeir.

10:09:19 22                    THE COURT:  Good morning to you.

10:09:21 23                    Okay.  So we have a couple of motions here.

10:09:27 24    Connatix, is that how you say it?  Connatix.  I don't know

10:09:30 25    how you say that.

10:09:32  1          MS. MORRISON:  Connatix.

10:09:33  2          THE COURT:  Connatix's motion to dismiss the

10:09:36  3   induced infringement claims and to dismiss the breach of

10:09:44  4   contract claim.  And then AlmondNet's motion to dismiss the

10:09:50  5   abuse of process counterclaim.

10:09:52  6          So I'm going to start with the motion to dismiss

10:10:02  7   the induced infringement claims, but I notice that the

10:10:06  8   plaintiff didn't respond at all to the motion to dismiss the

10:10:10  9   breach of contract.  Are you giving that up?

10:10:13 10          MR. SCHEUFLER:  That's correct, Your Honor.

10:10:14 11          THE COURT:  Okay.  So that one we'll grant that

10:10:18 12   and dismiss that.

10:10:19 13          So let me hear on induced infringement.  And for

10:10:24 14   that, I know that you guys cited a whole bunch of law from

10:10:29 15   Judge Connolly about, you know, specific intent for

10:10:32 16   inducement.  I don't typically require that.  I think that

10:10:37 17   if you show knowledge of the patent and knowledge of

10:10:40 18   infringement, that you can state an inducement claim.  I

10:10:47 19   would ask you not to put a bunch of stuff up there from

10:10:50 20   Judge Connolly when I just respectfully disagree about the

10:10:55 21   extent that is required to state a claim for inducement.

10:11:00 22          MR. SUNDERMEIR:  Thank you, Your Honor.  Grayson

10:11:02 23   Sundermeir from Fish & Richardson on behalf of Connatix.

10:11:05 24   Understanding that, Your Honor, my focus here is not on the

10:11:09 25   specific intent to infringe, but really on what is

10:11:11 1   sufficient to plead the act of inducement.  Right?

10:11:16 2           And so the problem here is that AlmondNet's

10:11:18 3   pleadings point only to the provision of Connatix's product,

10:11:21 4   these IDs, identification as the inducing act.  But that is

10:11:27 5   insufficient to plead inducement.  I think it's clear from

10:11:30 6   their pleadings that all they are pointing to is this

10:11:33 7   sending of an ID and then allegedly just providing that ID

10:11:37 8   is what causes a DSP to infringe.  And we can see that in

10:11:43 9   paragraph 21 of their complaint with respect to the '398

10:11:46 10  patent.  It's also present in paragraph 30 of their

10:11:49 11  complaint with respect to the other asserted patent, the

10:11:51 12  '146.  It's also clear from their answering brief, page 5,

10:11:54 13  they point out that sending the ID causes the DSP to

10:11:59 14  infringe.

10:12:00 15          And I'll note that their notice letter that is

10:12:02 16  attached to the pleadings, depending on whether you're

10:12:04 17  looking at the sealed complaint or the public complaint, the

10:12:06 18  numbers change.  But from the public complaint, which is

10:12:09 19  DI-9, it would be Exhibit 1 at page 15 and page 14.  Again,

10:12:14 20  pointing to simply the provision of IDs as the act of

10:12:19 21  inducement.  I won't go through every example, Your Honor,

10:12:22 22  but there are certainly more from the claim charts they

10:12:25 23  attach as well.

10:12:26 24          The problem is that that is insufficient to

10:12:28 25  plead inducement of the method claims.  So we have a *Power*

10:12:36  1    *Integrations* case we cite in our briefing, Your Honor, there

10:12:37  2    is also discussion of the Helios case.  I think the Helios

10:12:42  3    case is most instructive that just providing the product

10:12:45  4    alone isn't enough to show inducement of the method claims

10:12:48  5    that are at issue here.

10:12:50  6         And I do want to take a moment to say these are

10:12:53  7    method claims, they are not asserting apparatus claims --

10:12:56  8         THE COURT:  I saw that.  I went back to look and

10:12:59  9    see what claims are being asserted in the complaint.

10:13:01 10         MR. SUNDERMEIR:  Right.  With those method

10:13:03 11    claims there are steps that are required beyond just using

10:13:06 12    IDs.  And we point these out in our briefing as well, most

10:13:10 13    clearly I think in our reply brief.  But these claims

10:13:14 14    require sending an indicia of a condition to the third-party

10:13:17 15    server.  Checking if that condition is true.  Displaying an

10:13:20 16    advertisement to a visitor if the condition has been met.

10:13:23 17    Causing an action to be taken automatically with respect to

10:13:26 18    a particular device.  All of these things are required by

10:13:29 19    the method claims, but there is nothing in the complaint or

10:13:32 20    any of the pleadings from AlmondNet that would show that

10:13:34 21    just by simply providing identifications they're thereby

10:13:40 22    inducing a third-party to take all these steps.  They

10:13:43 23    actually concede this in their answering brief.  If you look

10:13:46 24    at their answering brief at page 10.

10:13:48 25         THE COURT:  Hold on.  Make sure I have it here.

10:13:52  1            MR. SUNDERMEIR:  This would be their answering

10:13:54  2    brief at page 10.

10:13:55  3            THE COURT:  I have the wrong case open.  Let me

10:13:59  4    just get to this one.

10:14:00  5            MR. SUNDERMEIR:  If it would help, Your Honor, I

10:14:03  6    can also use the Elmo.

10:14:26  7            THE COURT:  Okay.  Page 10.

10:14:28  8            MR. SUNDERMEIR:  Page 10, you'll see at the top

10:14:31  9    paragraph there is a long link.  It's the sentence that

10:14:33 10    follows that link in the top paragraph starting with the

10:14:35 11    word "likewise."

10:14:36 12            "Likewise, while the operation of DSPs is

10:14:39 13    well-known, AlmondNet's allegations do not rest on Connatix

10:14:42 14    instructing DSP's on how to use data."

10:14:45 15            So even they are conceding that even providing

10:14:47 16    these IDs to their customers, the DSP's or otherwise it's

10:14:53 17    not entirely clear how they pled who the customers are, even

10:14:58 18    they are conceding that they're not alleging that Connatix

10:15:01 19    is instructing DSP's how to perform the claimed methods by

10:15:07 20    virtue of providing these identifications.

10:15:09 21            Now, from the briefing, and I don't know what my

10:15:12 22    colleague from Russ August will discuss today, but from the

10:15:16 23    briefing it seems that AlmondNet is pointing to

10:15:19 24    advertisements on Connatix's websites and perhaps these

10:15:23 25    advertisements are supposed to be somehow inducing the

10:15:26  1    infringement.

10:15:26  2              There is two problems with that, though, Your

10:15:28  3    Honor.  The first is they aren't alleging that provision of

10:15:33  4    the advertisements is the act of inducement.  Again, it's

10:15:36  5    very clear from their briefing that what they're alleging is

10:15:40  6    the act of inducement is simply providing ID, not

10:15:44  7    advertisements.  And even if we were to focus on the

10:15:47  8    advertisements, it's not clear from the pleadings who they

10:15:50  9    are even directed to.  I think it's the *Power Integrations*

10:15:53 10    case we cite, Your Honor, the Supreme Court has said induced

10:15:57 11    as it's used in the context of 271(b) means to lean on, to

10:16:01 12    influence, to prevail, to move by persuasion, each of those

10:16:06 13    definitions require some sort of successful communication

10:16:10 14    between the third-party inducers and the alleged infringer

10:16:13 15    and they haven't shown any of that.  All they have pointed

10:16:17 16    to is the provision of these products, so from that

10:16:19 17    perspective we think this is more like the Helios case we

10:16:19 18    discussed in our briefing --

10:16:21 19              THE COURT:  The Helios case that is -- that's

10:16:26 20    one of the Judge Connolly cases.

10:16:28 21              MR. SUNDERMEIR:  That's correct, Your Honor.

10:16:30 22              THE COURT:  Okay.  Do you have anything from the

10:16:33 23    Federal Circuit that says just providing, you know,

10:16:37 24    essentially a product that is used in connection with the

10:16:41 25    method is sufficient?

10:16:42 1          MR. SUNDERMEIR:  For that, Your Honor, I should

10:16:45 2   point back to the *Power Integrations* case we cite in our

10:16:48 3   pleadings as well, this would be our reply brief at 2 and

10:16:51 4   again that's where the court noted how the Supreme Court has

10:16:55 5   interpreted what the inducement requirement is under 271(b).

10:16:58 6   So inducement requires some sort of affirmative act to

10:17:04 7   encourage infringement with the knowledge that the induced

10:17:06 8   acts constitute patent infringement.

10:17:08 9          THE COURT:  Then you're just getting way into

10:17:10 10  the whole issue of -- like I just told you, I think that the

10:17:15 11  way I read it is you need to have knowledge of the patent

10:17:19 12  and knowledge that what you are doing is, you know, a

10:17:24 13  knowledge that this person is going to infringe using what

10:17:26 14  you're giving them.  But I don't -- maybe I'm wrong.  It

10:17:38 15  would be very helpful if there was a case that said look,

10:17:41 16  just because I give them the computer doesn't mean I'm

10:17:46 17  inducing them to use a method.  And that seems right to me.

10:17:50 18  Right?

10:17:55 19          You're going on, oh, I need -- the way you're

10:17:58 20  arguing it, maybe this isn't what you mean, the way you're

10:18:01 21  arguing it is I have to really want them to infringe.  I

10:18:05 22  have to be like do it, go do it, go infringe, and that's not

10:18:08 23  the way I read the law.

10:18:10 24          So what I need is something that says look, I

10:18:12 25  have to give -- even though I know that they're going to use

10:18:16  1    what I do, that that is infringing or, you know, that that's

10:18:23  2    been alleged to be infringing, there needs to be more.

10:18:29  3    That's the case I need, not this focus on my state of mind

10:18:36  4    and my specific intent.  So that's what I am struggling

10:18:41  5    with.

10:18:42  6            MR. SUNDERMEIR:  I understand, Your Honor.  And

10:18:43  7    I wouldn't take it so far as it needs to be maybe as

10:18:46  8    strenuously as you articulated a moment ago, but some sort

10:18:50  9    of communication, something that shows an --

10:18:52 10            THE COURT:  But like what?  What would be

10:18:55 11    sufficient?  Because it's like here, use this in the method.

10:18:59 12    I mean, you know what they're using it for, right?  Or maybe

10:19:03 13    they use it for lots of things.  I have no idea.  But I

10:19:07 14    don't know what you mean by communication.  There is a

10:19:09 15    communication in that you give them something, right?  Your

10:19:14 16    client provides them with whatever.  So I don't know, what

10:19:20 17    kind of communication are you talking about?  Like a

10:19:23 18    communication that says hey, use it in the method?  I mean,

10:19:27 19    that's where I'm -- that's where I'm falling down.  I don't

10:19:30 20    know what you mean.

10:19:32 21            MR. SUNDERMEIR:  I think maybe another parallel

10:19:34 22    we can draw, there is a discussion in both of our briefs

10:19:37 23    about this Lifetime Industries case, there was found to show

10:19:41 24    sufficient inducement, because the issue there was there was

10:19:44 25    a seal, right, technology at issue was a seal, you could

10:19:45 1    have an RV with a pop-out side and there is a seal that goes

10:19:49 2    around that.  So what the sufficient pleadings there showed

10:19:52 3    was that they were going out to the customers and helping

10:19:57 4    them install this infringing seal.  They were doing

10:20:00 5    something to affirmatively encourage the infringement.

10:20:04 6           And the line that we would draw -- I don't know

10:20:05 7    exactly where the tipping point is, but what I would say for

10:20:09 8    our position is simply just giving the product isn't enough.

10:20:12 9    And if the theory is that providing the product is somehow

10:20:16 10   in and of itself the inducement, maybe there is specialized

10:20:21 11   data that just by giving it to a DSP they could infringe,

10:20:25 12   that's more of a contributory infringement point --

10:20:27 13          THE COURT:  I was going to say that sounds more

10:20:29 14   like contributory infringement.

10:20:32 15          MR. SUNDERMEIR:  Right.  And they do have

10:20:33 16   contributory infringement allegations at least for one of

10:20:36 17   the asserted patents here and that's a different issue, but

10:20:39 18   if they're going to pursue the inducing framework, there

10:20:43 19   needs to be something more than just giving the product.

10:20:45 20          THE COURT:  Okay.

10:20:46 21          MR. SUNDERMEIR:  The only other point I'll make

10:20:48 22   is the second point from our briefing, with respect to the

10:20:51 23   '146 patent, AlmondNet has not identified a direct

10:20:55 24   infringer.  They really show and we make this point in our

10:20:58 25   briefing as well, it's a possibility that DSP would use

10:21:01 1  this, it's sort of based on industry custom, generally they

10:21:06 2  might use this.

10:21:08 3           THE COURT:  Why is that appropriate for a motion

10:21:10 4  to dismiss as opposed to a motion for summary judgment if

10:21:13 5  the record shows that no one ever does this?  At this stage,

10:21:17 6  why can't they plead that on information and belief?

10:21:20 7           MR. SUNDERMEIR:  I think the problem with the

10:21:22 8  way they chose to plead it in this case is we really don't

10:21:26 9  know who they are saying the direct infringers are, maybe

10:21:28 10 it's DSP's, maybe it's customers, maybe it's our customers

10:21:32 11 that are DSP's.  The universe of entities that they say are

10:21:38 12 the direct infringers here I think is not very clear from

10:21:40 13 the briefing.  If that clarity was there, there would be a

10:21:43 14 different discussion, but the problem is the way they pled

10:21:46 15 that allegation its very nebulous and open ended.  We don't

10:21:50 16 even know the boundary of who they are saying are the direct

10:21:53 17 infringers here.

10:21:55 18          THE COURT:  Okay.

10:21:56 19          MR. SUNDERMEIR:  With that, Your Honor, unless

10:21:58 20 you have further questions.

10:21:59 21          THE COURT:  No, that's helpful.  Thank you very

10:22:01 22 much.

10:22:02 23          Let's be clear on the terms of inducement,

10:22:05 24 induced infringement, you're only asserting it after the

10:22:09 25 notice letter?

10:22:11  1          MR. SCHEUFLER:  Yes, Your Honor.

10:22:11  2          THE COURT:  Okay.  And so if you're saying like

10:22:18  3  there is all these steps in the method claims, don't you

10:22:23  4  have to say something more than they gave them this thing

10:22:27  5  that can be used in the method?  Like how is that saying

10:22:31  6  they are inducing use of the method, and how is that

10:22:34  7  different from examples where you have a method that uses a

10:22:38  8  computer and Apple sells them the computer, that's not

10:22:44  9  inducing infringement, even they couldn't infringe if they

10:22:48 10  didn't have that computer, so why is this different?

10:22:51 11          MR. SCHEUFLER:  Yes, Your Honor.  So I think the

10:22:52 12  answer is slightly different for each of the claims.  So if

10:22:55 13  I could take a step back for a moment to talk about what the

10:23:00 14  environment we're actually dealing with and how these DSP's

10:23:04 15  and SSP's and all this other jargon actually works because I

10:23:09 16  think it will help answer your question.

10:23:10 17          So in this general setup we have basically three

10:23:14 18  entities.  We have a user who is being advertised to.  The

10:23:19 19  demand side provider or DSP who is trying to place an ad,

10:23:24 20  they're the advertiser or they're working for the

10:23:27 21  advertiser.  And then the SSP or supply side provider, they

10:23:32 22  manage the advertising space.  And what happens here is a

10:23:35 23  user will go about their --

10:23:37 24          THE COURT:  I don't know what manage the

10:23:39 25  advertising space means.

10:23:41 1          MR. SCHEUFLER:  So they have many media entities

10:23:44 2     who have websites out there that have various advertising

10:23:48 3     space and they contract with a supply side provider to get

10:23:52 4     ads placed on them.  So the supply side provider will go out

10:23:57 5     to DSP's, solicit bids for advertisements on that space and

10:24:04 6     then get that advertisement placed there.

10:24:08 7          So the user will go about their regular internet

10:24:13 8     activity and data will be collected about them.  In this

10:24:16 9     instance we're talking about what LiveIntent does.

10:24:20 10          LiveIntent will collect information about a

10:24:22 11     user, assign them a LiveIntent ID.  Here it's shown as

10:24:27 12     ABC123, to somewhat anonymize the user.  And it will

10:24:33 13     associate what that user has done, search gardening, has an

10:24:37 14     interest in various hobbies that potential advertisers might

10:24:40 15     want to advertise to.

10:24:42 16          So all that --

10:24:44 17          THE COURT:  I can't read those.  Can you make

10:24:46 18     that bigger?

10:24:49 19          MR. SCHEUFLER:  Can you see about zooming in.

10:24:51 20          This is also attached to our complaint.

10:24:57 21          THE COURT:  I can't read that sitting up here

10:25:01 22     either, it's too small.

10:25:02 23          So this is good.  Okay.  I see the user.

10:25:05 24          MR. SCHEUFLER:  So that's the user going about

10:25:08 25     and data is being collected about them by all sorts of

10:25:12  1   entities.  Here we're talking about what LiveIntent does to

10:25:15  2   collect its LiveIntent IDs and associate various

10:25:19  3   advertisable information about them.

10:25:21  4        Then the user will go and visit a site

10:25:24  5   associated with the supply side provider.  The supply side

10:25:30  6   provider's site has ad space that could be shown to this

10:25:34  7   user.  It gets that user's ID and then it sends out a

10:25:39  8   request for bids.  It's soliciting advertisements from the

10:25:43  9   DSP.  It says hey, advertise here for this instance, here is

10:25:47 10   the person that we're advertising to, come advertise to this

10:25:50 11   person on our site.  DSP's that are interested will submit

10:25:56 12   bids based off of what they're advertising.  In the

10:25:59 13   gardening example this could be Home Depot advertising

10:26:03 14   particular gardening tools and equipment.  And because Home

10:26:10 15   Depot knows who they're advertising to knows that they have

10:26:13 16   a better chance at a sale for this person, this is better

10:26:17 17   for them than a broad sweep of advertising to just everyone,

10:26:21 18   say, over the radio or similar.  And so they'll be willing

10:26:25 19   to bid higher per ad placement than otherwise.

10:26:30 20        And this is why the SSP does it, because they

10:26:33 21   get more money coming in.  This is why the SSP wants the DSP

10:26:41 22   to use this ID, it is not just merely providing it out into

10:26:45 23   the ether, it is hey, use this because we know when you use

10:26:52 24   it, we're going to get paid more.

10:26:54 25        As to the various steps, could you turn to slide

2.

The method of claim 13 is broken up into A and B, but it's really just the one step and B is a wherein clause further modifying.

So here it is, the step is the DSP utilizing the IDs provided in the bid, in that solicitation for an advertisement that will associate from the first profile --

THE COURT:  I don't know if you're saying who the -- like, DSP's, SSP's, and end users.  I don't know, like what is Defendant?  Where is the Defendant in that list?

MR. SCHEUFLER:  The Defendant is the SSP.  The direct infringer is the DSP.  The user is not associated with the infringement.

THE COURT:  Okay.

MR. SCHEUFLER:  So the direct infringement happens when the DSP utilizes the ID.  The ID would be developed from you're searching on your phone, that's the first electronic profile.  And then you're on your laptop with your same IP address and your same WiFi.  And so based off of the information collected from your phone, provided by -- with the ID provided by the SSP, an advertisement is sent to you on your laptop.

So by providing information about a first profile, the SSP provides information on a first profile.

10:28:35 1    For advertisements on a second profile, it actively

10:28:39 2    encourages the infringement of both steps, not just one.

10:28:50 3    You'll see B is a wherein clause specifying that the

10:28:55 4    association between these two profiles is based off of a

10:28:58 5    common local area network, a common WiFi, a house WiFi.

10:29:03 6                THE COURT:  Well, does Connatix or LiveIntent

10:29:11 7    care about whether it is a common local area network?

10:29:18 8                MR. SCHEUFLER:  That's specifically how

10:29:20 9    LiveIntent --

10:29:21 10               THE COURT:  What's the relationship between

10:29:22 11   Connatix and LiveIntent?  Because like when I'm looking at

10:29:25 12   the Connatix complaint, there is all this stuff about

10:29:28 13   LiveIntent in there.  I don't understand.  But you sued them

10:29:31 14   both.

10:29:31 15               MR. SCHEUFLER:  Yes.

10:29:32 16               THE COURT:  The same thing that Connatix is

10:29:34 17   doing you're saying they do through LiveIntent, but you're

10:29:38 18   suing both of them separately?

10:29:40 19               MR. SCHEUFLER:  Yes, Your Honor.

10:29:41 20               THE COURT:  You're double dipping on the same

10:29:44 21   acts of infringement?

10:29:46 22               MR. SCHEUFLER:  I am not certain about how the

10:29:50 23   liability plays out between the various acts of

10:29:53 24   infringement.  Here Connatix is using LiveIntent as a vendor

10:29:58 25   for these user IDs that it uses and collects information

10:30:03 1   with and then provides to get better DSP's with bids.

10:30:13 2             THE COURT:  So I still need some help with how

10:30:15 3   are they -- what they do is they provide an ID.  And how is

10:30:20 4   it that providing an ID is inducing the DSP to infringe?

10:30:31 5             MR. SCHEUFLER:  So I would disagree with the

10:30:33 6   characterization that it's just providing an ID.  What

10:30:37 7   Connatix is doing is it's soliciting bids for advertisement,

10:30:43 8   it's saying come advertise with us.  Specifically come

10:30:46 9   advertise to user ID ABC123.  And certainly a DSP could take

10:30:54 10  that and aim their advertisements at not that user, but that

10:30:58 11  wouldn't make any business sense.  The best use of your

10:31:04 12  advertising money by the DSP would be to target to that

10:31:08 13  particular user.

10:31:09 14            So it's not hey, do with this product what you

10:31:15 15  will, it's come do this very specific thing, advertise to

10:31:17 16  this particular user.

10:31:21 17            THE COURT:  Yes.  But okay, you just like have A

10:31:25 18  and B thrown up there on the screen.  I don't know how

10:31:28 19  you're saying they're inducing them to do these steps.

10:31:32 20  That's what I'm missing.  You just like have it up there

10:31:35 21  with stuff highlighted.  Go through it.  Explain to me how

10:31:39 22  doing what they're doing, saying come advertise with me and

10:31:42 23  here is an ID is inducing these steps.

10:31:45 24            MR. SCHEUFLER:  All right.  Could you move to

10:31:47 25  slide 4.

10:31:48  1            So --

10:31:51  2            THE COURT:  I need the claim language.  You have

10:31:53  3  to show me the claim language and then explain to me how

10:31:57  4  they're inducing this.

10:31:59  5            MR. SCHEUFLER:  Slide 2, please.

10:32:03  6            All right.  So limitation 13(a).  "Based on

10:32:08  7  first electronic profile data associated with an electronic

10:32:12  8  identifier of a first device."

10:32:16  9            THE COURT:  I don't know what that means.  What

10:32:20 10  is that?

10:32:20 11            MR. SCHEUFLER:  That is profile data collected

10:32:22 12  from a user on a first device.  So profile data collected

10:32:27 13  while you're browsing on your phone.

10:32:29 14            THE COURT:  Where is that?  Who does that?

10:32:31 15            MR. SCHEUFLER:  This information is collected by

10:32:34 16  LiveIntent in this instance and used by the DSP.  So the

10:32:38 17  DSP's are basing their actions off of this data collected by

10:32:43 18  LiveIntent.

10:32:45 19            So an action to be taken with respect to a

10:32:48 20  second device, that action is --

10:32:52 21            THE COURT:  Automatically causing with the

10:32:55 22  computer system, so that's in the DSP's computer system?

10:33:01 23            MR. SCHEUFLER:  Yes, Your Honor.

10:33:02 24            THE COURT:  Okay.

10:33:03 25            MR. SCHEUFLER:  An action to be taken with

10:33:05 1  respect to a second device.  That is the advertisement, the

10:33:09 2  bidding for that -- placing that ad.

10:33:12 3          A second device that is indicated at the time of

10:33:16 4  the action by an electronic identifier electronically

10:33:19 5  associated with the first identifier.  Another word salad.

10:33:24 6  The second device is associated with that first device, the

10:33:28 7  first identifier.

10:33:30 8          So in this instance, this could be the first

10:33:32 9  device is you're searching on your phone.  The second device

10:33:36 10 is you're searching on your home computer.  And they're

10:33:41 11 associated together by being used by the same individual.

10:33:47 12         So Connatix's role in this is they have the

10:33:52 13 information about the second device and they're trying to

10:33:56 14 get ads placed on that second device.  So they are

10:34:01 15 submitting a request for bids, a solicitation for

10:34:04 16 advertisement --

10:34:05 17         THE COURT:  I'm sorry, I don't know what the

10:34:07 18 first and second devices are.  I truly don't.  I thought you

10:34:11 19 said that the first device was your phone and the second was

10:34:13 20 your home computer, but now you're saying they want an ad on

10:34:17 21 the second device, so I don't understand.  Sorry.

10:34:20 22         MR. SCHEUFLER:  So the first device, you're

10:34:26 23 searching whatever your hobby is, let's say cooking, pretty

10:34:33 24 generic, you're searching up a recipe on your phone.  It

10:34:37 25 requires some special ingredients and specialized equipment.

10:34:41  1  So LiveIntent in working with whatever website you're

10:34:46  2  searching collects your data and associates it with all

10:34:50  3  right, it's based off of this phone, it gets your phone ID

10:34:53  4  and other various information to associate it with

10:34:55  5  particular user identification.

10:34:57  6         And then later on, you're doing different

10:35:00  7  browsing on a different device, and you open up a new

10:35:05  8  website and it has advertising space on it.  That new

10:35:09  9  website is associated, or its advertising space is

10:35:14 10  controlled by Connatix as the SSP, the supply side provider.

10:35:19 11  It wants to place ads on that targeted at the user, and it

10:35:24 12  knows which user it is.  It has the user's ID.  That user's

10:35:30 13  ID has this information from your browsing on the first

10:35:34 14  device on that first website.  And so Connatix includes that

10:35:38 15  information in its request for bids, hey, come advertise to

10:35:42 16  this person, here is all their information.

10:35:51 17         THE COURT:  Okay.

10:35:53 18         MR. SCHEUFLER:  Can we move to the next slide.

10:35:56 19         And so B is a wherein clause wherein the

10:36:00 20  electronic association between the first and second device

10:36:03 21  identifiers, that's connecting the user between the two

10:36:07 22  devices, is based on a connection before the action, before

10:36:12 23  placing the ad, of each of the first and second devices,

10:36:18 24  phone and home computer, independently of the other, to a

10:36:23 25  common local area network.  So they're connected to the same

10:36:27  1    WiFi.

10:36:27  2             Wherein the computer system is connected to the

10:36:30  3    local area network through the internet but not in the local

10:36:34  4    area network.  So the computer system --

10:36:37  5             THE COURT:  And that's where I'm getting

10:36:39  6    confused because like -- a lot of this, like why in the

10:36:43  7    world would the SSP care if you're doing it, like between me

10:36:50  8    using my computer at work on a different WiFi than my

10:36:54  9    computer at home, versus like -- why is this part of where

10:37:00 10    you think that they're inducing this?

10:37:03 11             MR. SCHEUFLER:  So this limitation is important

10:37:05 12    for navigating all the various different privacy issues.  As

10:37:09 13    I said, the user ID doesn't -- it somewhat anonymizes so

10:37:17 14    instead of being John Smith, it is user ABC123.  Because

10:37:22 15    there are lots of privacy concerns in this space, we don't

10:37:26 16    want to have, all right, you're targeting this John Smith,

10:37:30 17    here is also their Social Security number.  We are trying to

10:37:33 18    be more flexible with it.

10:37:36 19             So all right, we're pretty sure this is the same

10:37:39 20    user or at least there is similar -- there is relevance here

10:37:45 21    based off of their searching for relevant information on

10:37:49 22    this same local area network.

10:37:51 23             This also helps in instances of blocking

10:37:58 24    business, you're searching, you're in a target and you're

10:38:01 25    searching something on your phone and there is also

10:38:04 1   advertisement going on on a screen, and so based off of what

10:38:07 2   you're searching on your phone, they might pop in a relative

10:38:11 3   advertisement on a smart TV that's playing.  There are many

10:38:15 4   different implementations of this that are particularly

10:38:19 5   useful.

10:38:36 6          I can jump to slide 10 to discuss the '146.

10:38:39 7          Here again we're discussing the DSP's

10:38:43 8   infringement.  It's a similar case with different ID

10:38:46 9   information.  Here the DSP is utilizing again IDs provided

10:38:52 10  in the bid request to perform this electronic method, this

10:38:57 11  preamble.  It doesn't say much.

10:38:59 12         The next slide.  Bigger one.

10:39:02 13         Here, it's similar for a multitude of different

10:39:06 14  electronic visitors to a first media site, this is

10:39:11 15  identifying the visitors to a first property, say Google,

10:39:16 16  you're searching up your cooking recipe on Google.  And then

10:39:20 17  the DSP will automatically with its computer system

10:39:24 18  directing to a third-party server computer controlling

10:39:27 19  advertising space, that is the supply side provider, that is

10:39:31 20  Connatix here, so it's directing to them on a second media

10:39:39 21  property -- so this is a new website that the user is

10:39:42 22  visiting -- indicia of a condition, which condition relates

10:39:46 23  specifically to the electronic visitor.

10:39:49 24         So here it's sending an advertising bid and all

10:39:55 25  of the information associated with that, including the ad,

10:39:58  1    how much to pay, and all the information that Connatix will

10:40:02  2    require to be able to process the bid.

10:40:07  3            For display of an advertisement to the

10:40:11  4    electronic visitor when the electronic visitor visits the

10:40:15  5    second media property -- that's just what I said -- at the

10:40:19  6    time after the electronic visitors visits the first media

10:40:22  7    property.  So it's spacing it out in time.  You first visit

10:40:25  8    this, information is collected, then you visit the second

10:40:29  9    place, an advertisement is based off of that second

10:40:31 10    information.

10:40:32 11            The next slide.

10:40:35 12            Another wherein, directing the indicia is based

10:40:41 13    off of -- on information indicating to the computer system

10:40:44 14    information indicating to the DSP that at least one of a

10:40:48 15    plurality of profile attributes is possibly applicable to

10:40:53 16    the electronic visitor.  This is some -- the indicia, the

10:40:59 17    bid is based off of some information about the user.  Here

10:41:02 18    we have been using the cooking example.  We're interested in

10:41:05 19    a particular recipe or cooking generally.  So the bid is

10:41:09 20    based off of that.  That's exactly what Connatix wants

10:41:12 21    because that increases the bid price.

10:41:15 22            Which indicates profile attribute or attributes

10:41:21 23    was received by the computer system, the DSP, as a result of

10:41:25 24    the electronic visitor visiting the first media property.

10:41:28 25    Again, this is the information collected by Google when

10:41:31  1    you're searching up the recipe.

10:41:33  2                 The next slide.

10:41:35  3                 And also requires that the advertisement is

10:41:38  4    relevant to that profile attribute or attributes.  So it

10:41:43  5    would be an advertisement for cooking ingredients, cooking

10:41:47  6    equipment, or the like.

10:41:48  7                 And so why does Connatix care about this?  I

10:41:54  8    think we can be very succinct.  Turning to slide 14.  This

10:42:00  9    is Connatix strongly recommends enabling users to sync

10:42:05 10    through iFrames, that's to provide that cookie ID that we're

10:42:10 11    talking about with respect to the '146 patent.  This

10:42:12 12    functionality improves DSP user match rate and increases the

10:42:19 13    bid rate and the bid price.  So why does Connatix want this?

10:42:22 14    Because it makes them more money because --

10:42:25 15                 THE COURT:  And I get what you're saying.  My

10:42:27 16    problem is that you're saying that they induce, and I

10:42:33 17    understand why they want to increase the ad things, but

10:42:39 18    that's not what's claimed.  What's claimed is a set of very

10:42:43 19    specific steps.  And what they seem to be doing is providing

10:42:48 20    an ID.  And I'm trying to understand where we are in terms

10:42:53 21    of providing an ID.  Is that inducing, or asking live

10:43:03 22    whatever to give over an ID?  I'm trying to figure out where

10:43:08 23    that falls on the inducement scale.  Right?

10:43:14 24                 I mean, I get it, I understand why they want to

10:43:16 25    do it, but there is a whole bunch of steps in there,

10:43:19  1  including being on the same network and, you know -- I don't

10:43:23  2  have a clue whether that's something that is used that they

10:43:30  3  know about.  I don't know.

10:43:32  4          MR. SCHEUFLER:  Well, at this point they do know

10:43:34  5  about it.  We provided our notice letter to inform them of

10:43:38  6  how the infringement goes.  They're in the industry.  They

10:43:42  7  know how these privacy issues are concerns and how

10:43:46  8  LiveIntent develops its ID as they are partnered in this.

10:43:53  9  But I think further detail on this is properly subject to

10:43:58 10  fact discovery and further in this case.

10:44:02 11          THE COURT:  And just so we're clear because

10:44:08 12  Defendants raised, I think fairly, we don't even know who

10:44:12 13  the direct infringer is.  Do I understand that you are

10:44:16 14  saying that the direct infringer is the DSP?

10:44:19 15          MR. SCHEUFLER:  Yes, Your Honor.

10:44:20 16          THE COURT:  That's it, not the customers, not

10:44:23 17  the SSP, it's the DSP?

10:44:25 18          MR. SCHEUFLER:  It's the DSP, Your Honor.

10:44:27 19          THE COURT:  All right.  Mr. Sundermeir.

10:44:31 20          MR. SUNDERMEIR:  Thank you, Your Honor.

10:44:36 21          So I heard counsel from AlmondNet suggested the

10:44:42 22  act of inducement is not just the provision of IDs, it's

10:44:45 23  more than that.  Respectfully I have to disagree.  I think

10:44:49 24  it's very clear from their complaint, from their briefing,

10:44:51 25  they're only pointing to the provision of IDs.

10:44:54   1          So if we look at paragraph 30, again, of their

10:44:57   2     complaint, they state that because sending that ID causes

10:45:02   3     the DSP's to insert claim language, right, with respect to

10:45:07   4     the device and the advertisement that will be shown --

10:45:11   5     excuse me, that's paragraph 21.  I said paragraph 31.

10:45:14   6     That's paragraph 21.

10:45:15   7          It's also in their answering brief.  If we look

10:45:18   8     at their answering brief at page 5, this is at the -- I can

10:45:24   9     put this on the Elmo unless you have the answering brief in

10:45:28  10     front of you.

10:45:29  11          THE COURT:  Okay.

10:45:31  12          MR. SUNDERMEIR:  But on page 5 of their

10:45:32  13     answering brief their point is sending that ID causes DSP's

10:45:38  14     to infringe.

10:45:39  15          In their answering brief as well, they also cite

10:45:42  16     a number of things from the notice letter that their counsel

10:45:45  17     referred to.  But it's clear even looking at the excerpts

10:45:48  18     that they cited in their own briefing --

10:45:50  19          THE COURT:  I'm not so interested in the

10:45:53  20     briefing because I'm not going to let them add what's in

10:45:56  21     their complaint based on the briefing, so I'm not going to

10:45:59  22     let you construe what's in the complaint, but the notice

10:46:02  23     letter is attached to the complaint if you want to talk

10:46:04  24     about that.

10:46:05  25          But, you know, just saying well, this is what

10:46:07  1    they said in their brief, it wouldn't help them if they left

10:46:11  2    something out of the complaint, so I find it hard to say

10:46:14  3    it's going to somehow change what's in the complaint.

10:46:17  4            MR. SUNDERMEIR:  That's fair, Your Honor.  I was

10:46:18  5    only using it as an illustrative point that they're doubling

10:46:22  6    down on the same thing we saw in the complaint.  I can keep

10:46:25  7    my examples to what's cabined in the complaint.  If we look

10:46:29  8    at paragraph 21 with respect to the '398 patent, it's very

10:46:33  9    clear they're pointing to only the notice letter, which I

10:46:37 10    will refer to it from the way it was in their briefing which

10:46:38 11    is DI 9-1 at pages 14 and 15.  At 15, they say send that ID

10:46:44 12    that causes the DSP's to infringe.  At 14 they're describing

10:46:49 13    facilitate the delivery of the DSP cookie ID as the inducing

10:46:54 14    act.  Even their claim charts, which it's voluminous in the

10:46:58 15    record, it's also excerpted in their brief, but again, they

10:47:02 16    point to just the identifier.

10:47:04 17            If this was some sort of act of inducement based

10:47:07 18    around the marketing literature that I saw counsel put up on

10:47:10 19    the screen now, maybe this is a different discussion, but

10:47:13 20    the problem is that as they have alleged and pled it in

10:47:15 21    their pleading, it is only the provision of the ID that they

10:47:19 22    say is the act of inducement.

10:47:25 23            The other piece, Your Honor, and just briefly is

10:47:27 24    slide 5 from counsel's presentation, I think makes this

10:47:32 25    point.

10:47:36 1          MR. SCHEUFLER:  We'll put it up.

10:47:38 2          MR. SUNDERMEIR:  Thank you.

10:47:40 3          What they have described in slide 5 of their

10:47:43 4  presentation, enumerated with the numeral 2 in the

10:47:46 5  highlighted box on the right-hand side of the slide, they've

10:47:49 6  never said Connatix is the SSP in the briefing.  I heard

10:47:52 7  that represented today.  I don't see it anywhere in their

10:47:55 8  briefing.

10:47:56 9          Even if we accept that as the case, the SSP

10:47:58 10 sends the user ID to the DSP -- I'm reading from the

10:48:02 11 highlighted box in the slide -- which decides to bid based

10:48:04 12 on the SSP declared user ID.  So the DSP can do what it

10:48:10 13 wants with this identification information.  It can make a

10:48:13 14 decision of its own.  It certainly doesn't have to follow

10:48:13 15 the specific method steps we have at issue here.  I saw a

10:48:15 16 number of references, particularly on slide 14 of

10:48:19 17 AlmondNet's presentation that looked at the indicia of the

10:48:22 18 condition and deciding the ad, how much to pay, any number

10:48:26 19 of these things that are required by the claims, all of that

10:48:29 20 is left to the decision of the DSP, it is not induced simply

10:48:33 21 by providing identifications.

10:48:37 22          So unless Your Honor has any further questions.

10:48:40 23          THE COURT:  Okay.  Thank you.

10:48:41 24          MR. SUNDERMEIR:  Thank you, Your Honor.

10:48:45 25          THE COURT:  Nope.  He gets the last word.  It's

10:48:47  1    his motion.

10:48:48  2                MR. SCHEUFLER:  All right.

10:48:50  3                THE COURT:  All right.  I am going to -- I am

10:49:15  4    going to deny the motion for inducement.  I do think this is

10:49:20  5    a very close case, but I'm going to let the inducement claim

10:49:24  6    go forward.  I have concerns that plaintiff really does seem

10:49:27  7    to be alleging that Connatix provides an ID.  And that's the

10:49:31  8    inducement, even though there are a lot of other

10:49:34  9    requirements of the claims that the DSP purportedly

10:49:39 10    performs.  But I think that this may be a situation where

10:49:46 11    getting some more -- letting some discovery go forward and

10:49:53 12    seeing where we ultimately end up in terms of proof as to

10:50:00 13    what Connatix is doing, because I don't think this is quite

10:50:05 14    at the stage where, you know, you provide a computer and the

10:50:11 15    computer is used in the method, that I don't think anybody

10:50:14 16    would say is inducement.  But this is somewhere in the

10:50:20 17    middle of the scale maybe.

10:50:22 18                But I'm not -- I don't know that ultimately it

10:50:25 19    would state a claim for inducement.  But I think based on

10:50:28 20    what I have heard and the allegations in the complaint, I

10:50:32 21    will let it go forward at this point.

10:50:36 22                Okay.  So that motion to dismiss is granted in

10:50:41 23    part and denied in part.  And I think we have clarified that

10:50:46 24    the assertions are only that the DSP is the party accused of

10:50:54 25    being the direct infringer and that any induced infringement

10:50:59  1    only would occur after the notice letter.

10:51:04  2             Okay.  So now we have the motion to dismiss

10:51:10  3    LiveIntent's counterclaim for abuse of process.

10:51:14  4             MR. SCHEUFLER:  Thank you, Your Honor.

10:51:18  5             So LiveIntent's pleading on this is very

10:51:24  6    generalized and very broad, but based off of what they pled,

10:51:29  7    they argue that AlmondNet is unable to compete in the market

10:51:34  8    fairly, our products are inferior.  We, of course, dispute

10:51:37  9    that, but it's sufficiently pled.  And that because of this,

10:51:43  10   we are approaching LiveIntent's customers to seek them to

10:51:48  11   sever their contracts with LiveIntent and instead work with

10:51:52  12   AlmondNet.  They plead that we made some undisclosed false

10:51:57  13   and misleading statements to LiveIntent's customers and

10:52:01  14   threatened to sue them as well with the intent to harm

10:52:04  15   LiveIntent.

10:52:05  16            Now, that threaten to sue them as well is the

10:52:10  17   only factual pleading that I believe actually relates to the

10:52:14  18   process here.  And that does not -- that does not survive

10:52:22  19   our constitutionally protected rights under the First

10:52:26  20   Amendment and the petition clause as described under

10:52:32  21   Noerr-Pennington, which entitles us to make these pre-suit

10:52:39  22   letters.

10:52:39  23            In fact, they're very important for us to be

10:52:41  24   able to assert induced infringement, otherwise we just have

10:52:45  25   to go straight to the complaint, straight to burden the

10:52:49 1    Court with our disputes and have no possibility of actually

10:52:52 2    discussing these first.

10:52:53 3            Now, this is what the intention of

10:53:00 4    Noerr-Pennington doctrine, it protects from this exact kind

10:53:05 5    of claim, abuse of process, as well as other sorts of

10:53:09 6    claims, but here abuse of process claims for patent

10:53:13 7    infringement.  The court in *Magnetar v. Six Flags* put it

10:53:19 8    this way.  Actions incidental to litigation such as

10:53:23 9    pre-litigation letters are immune and they will have to

10:53:27 10   plead somehow that they're not within this, or that they

10:53:31 11   have an exception.

10:53:33 12           They cannot plead that.  Instead their answering

10:53:38 13   brief discusses AlmondNet's intention here.  Because

10:53:41 14   AlmondNet cannot compete, its intention is not to forward

10:53:45 15   the litigation or in furtherance of any litigation, it's in

10:53:49 16   furtherance of harming LiveIntent's business.

10:53:52 17           Well, what does the Supreme Court have to say

10:53:58 18   about that?  The Supreme Court sets out that activity

10:54:08 19   ostensibly directed toward influencing governmental action

10:54:12 20   does not qualify under Noerr-Pennington if it is a mere sham

10:54:18 21   covering an attempt to interfere directly with the business

10:54:21 22   relationship of a competitor.

10:54:23 23           Well, what does the sham exception require?  The

10:54:27 24   sham exception requires first that the lawsuit must be

10:54:31 25   objectively baseless in the sense that no reasonable

10:54:34 1  litigant could realistically expect success on the merits.

10:54:41 2  And this is a quote from the Supreme Court in *Professional*

10:54:48 3  *Real Estate Investors v. Columbia Pictures*, only if the

10:54:49 4  challenge of litigation is objectively meritless may a court

10:54:54 5  examine the litigant's subjective motivation.  Under the

10:54:57 6  second part of the definition, a court should focus on

10:55:01 7  whether the baseless suit conceals an attempt to interfere

10:55:05 8  directly with a competitor's business relationship.

10:55:09 9        They have not pled, they have not argued, and

10:55:11 10  they cannot plead or argue that our case against LiveIntent

10:55:15 11  or any of the -- any of its customers is objectively

10:55:20 12  baseless.  Because there is no such pleading and this -- how

10:55:28 13  they have -- the actions they have pled fall squarely within

10:55:33 14  Noerr-Pennington, we believe the Court should dismiss these

10:55:36 15  claims.

10:55:36 16        THE COURT:  Okay.  Ms. Morrison.  So I have to

10:55:42 17  tell you when I read this complaint, or the counterclaim, I

10:55:47 18  mean, it almost sounds more like an intentional interference

10:55:53 19  with business, not an abuse of process.  So help me out

10:55:56 20  here.

10:55:56 21        MS. MORRISON:  Your Honor, if I could put our

10:55:58 22  complaint on the Elmo.  I want to focus on one particular

10:56:07 23  paragraph in our complaint which I think is the key

10:56:12 24  paragraph to establishing abuse of process.

10:56:15 25        So respectfully, I want to start by saying that

10:56:19 1    I think counsel for AlmondNet has misconstrued our argument.

10:56:23 2    Our argument is not that this is a sham litigation or that

10:56:26 3    it is an exception to Noerr-Pennington, but indeed that it

10:56:30 4    is conduct that is not at all within Noerr-Pennington.  I'll

10:56:33 5    get to that in a minute because I want to answer your

10:56:36 6    question.

10:56:36 7         Our allegation, and it's here in paragraph 37,

10:56:41 8    is that what AlmondNet is doing is going to LiveIntent's

10:56:45 9    customers -- and this is in the second sentence, that

10:56:48 10   they're contacting various of LiveIntent's customers,

10:56:52 11   they're referring to their patent infringement suit against

10:56:56 12   LiveIntent, and then they're seeking to get LiveIntent's

10:57:00 13   customers to sever their commercial relationships with us

10:57:04 14   and enter into a commercial arrangement with AlmondNet.

10:57:07 15        So what they're doing is using the facts of this

10:57:09 16   lawsuit against LiveIntent to try to get our customers to

10:57:14 17   stop working with LiveIntent and to instead work with

10:57:17 18   AlmondNet.  That's an abuse of process.  These facts are --

10:57:21 19        THE COURT:  Why is that an abuse of process?

10:57:23 20   Because they mention the lawsuit?  The abuse of process

10:57:26 21   would be if -- I mean, if they didn't have a basis for the

10:57:31 22   litigation, maybe, but I just -- I'm not understanding.  I

10:57:39 23   mean, if you have a case that you can bring and you go and

10:57:45 24   you say to customers, yeah, I did bring a litigation against

10:57:50 25   them and the customer says well, what are you going to do if

10:57:54  1    you win?  You're like well, I'm going to try to get an

10:57:58  2    injunction.  That doesn't sound like an abuse -- how is that

10:58:01  3    an abuse of process?  They can file a case and what, once

10:58:04  4    you file a case you're not allowed to talk about it with

10:58:07  5    anybody?  That's what I don't understand.  How is it abusing

10:58:10  6    the process?

10:58:10  7            Essentially an abuse of process as I understand

10:58:13  8    it is you're doing something that, you know, sort of is

10:58:22  9    outside of what you're allowed to do in legal proceedings.

10:58:26 10    And telling someone yeah, I filed a case and there could be

10:58:31 11    ramifications if I win for you, I just -- that doesn't seem

10:58:38 12    like abuse of process to me.

10:58:40 13            MS. MORRISON:  So I think, Your Honor, what

10:58:42 14    we're relying on is several cases from this district and one

10:58:46 15    from the Northern District of California that are cited in

10:58:49 16    our brief.  I'm happy to talk about the facts if that's

10:58:52 17    helpful.

10:58:52 18            But in *Nuance v. MModal*, I believe it was Judge

10:58:58 19    Burke found that very similar conduct by Nuance in that case

10:59:03 20    where Nuance basically made a press release about the

10:59:07 21    litigation and distributed it to MModal's customers and said

10:59:12 22    hey, come work with us instead.  That same kind of conduct

10:59:16 23    was found to be an abuse of process.

10:59:19 24            The same was true in *Arista*, which is -- I will

10:59:23 25    note it's a summary judgment case denying summary judgment

10:59:27 1    on abuse of process claims.  *Arista* -- there was the same

10:59:32 2    sort of thing where customers were contacted about --

10:59:35 3            THE COURT:  In *Nuance* there was more to it than

10:59:38 4    they just contacted those folks, right?  In *Nuance* they

10:59:42 5    wanted to essentially undercut the other company so they can

10:59:46 6    buy it at a cut rate price, right?

10:59:48 7            MS. MORRISON:  That was the allegation, yes.

10:59:50 8            THE COURT:  That was an allegation, it wasn't

10:59:51 9    just yes, we're telling our customers to come with them.  I

10:59:57 10   mean, I don't know -- okay.  So go ahead, you can tell me

11:00:03 11   what your allegations are here.

11:00:05 12           MS. MORRISON:  So our allegations are, just to

11:00:08 13   be very clear because I heard opposing counsel talking a lot

11:00:11 14   about Noerr-Pennington and exceptions to Noerr-Pennington

11:00:14 15   and all that.  And that's not -- we don't think that's

11:00:18 16   terribly relevant here because we're not alleging at this

11:00:20 17   point that this is a sham litigation or any of those things

11:00:24 18   that I just heard opposing counsel arguing about.  Instead

11:00:27 19   what we're arguing is this is conduct that is not protected

11:00:30 20   by the Noerr-Pennington doctrine because it is not

11:00:34 21   incidental -- contacting our customers and saying you should

11:00:39 22   come work with us, that's not incidental to this litigation.

11:00:43 23   It's completely separate and apart from it.  It's commercial

11:00:46 24   activity.  And so it's not that it is an exception to

11:00:50 25   Noerr-Pennington, but indeed it is conduct that is not even

11:00:54 1    protected by the Noerr-Pennington doctrine, it's petitioning

11:00:57 2    activity that is --

11:00:58 3              THE COURT:  I'm not worried about

11:01:00 4    Noerr-Pennington.

11:01:01 5              MS. MORRISON:  Okay.

11:01:02 6              THE COURT:  I'm more worried about your

11:01:03 7    allegations not being an abuse of process.  Why don't you

11:01:09 8    help me with that.

11:01:10 9              MS. MORRISON:  Sure.  In our view, the case law

11:01:12 10   supports that -- *Nuance v. MModal*, *PhishMe,* which is another

11:01:17 11   case from Judge Burke, and *Arista* case, in all of those

11:01:21 12   cases, similar conduct was found to be an abuse of process.

11:01:24 13              And Your Honor is correct that in *Nuance*, they

11:01:27 14   did go a little bit further and they alleged that it was

11:01:31 15   done for a particular reason.  We don't have those facts

11:01:35 16   yet, Your Honor, but we think discovery will elucidate that

11:01:39 17   AlmondNet has some ulterior purpose.

11:01:42 18              But at this stage of the game, what we know is

11:01:45 19   that AlmondNet is going out contacting LiveIntent's

11:01:48 20   customers and this is what we've alleged in our complaint

11:01:51 21   here at paragraph 37.  They're contacting our customers,

11:01:54 22   they're referring to this patent infringement litigation,

11:01:57 23   and they're attempting to use the patent infringement

11:02:00 24   litigation, the facts of the litigation, to convince

11:02:05 25   LiveIntent's customers to stop working with LiveIntent --

11:02:08  1          THE COURT:  So an abuse of process claim as I'm

11:02:10  2    reading this, you know, looking at Delaware law here, this

11:02:16  3    is an opinion that Judge Andrews did where he summarizes it,

11:02:21  4    he says some form of coercion to obtain collateral advantage

11:02:26  5    not properly involved in the proceeding itself must be shown

11:02:30  6    such as obtaining the surrender of property or the payment

11:02:33  7    of money by the use of the process as a threat or club, in

11:02:36  8    other words, a form of extortion is required.  An abuse of

11:02:40  9    process claim can arise only by showing a perversion of the

11:02:43 10    process itself.

11:02:45 11          So help me understand how this is a perversion,

11:02:48 12    what you have alleged is a perversion of the process itself.

11:02:53 13          MS. MORRISON:  So it's a perversion of the

11:02:58 14    process itself because AlmondNet is using this case to try

11:03:01 15    to drive LiveIntent out of business by taking its customers

11:03:05 16    by noting -- by using the fact of the patent infringement

11:03:13 17    suit to coerce LiveIntent's customers.  So I think there is

11:03:26 18    two coercions going on here, one to coerce LiveIntent's

11:03:31 19    customers to abandon LiveIntent and instead to work with

11:03:35 20    AlmondNet.

11:03:35 21          THE COURT:  But I mean, that's just like a

11:03:37 22    patent infringement suit, right?  A patent infringement

11:03:40 23    suit, you can argue -- you can get someone to stop

11:03:44 24    infringing and ask for an injunction, which would mean that

11:03:49 25    you couldn't supply to customers.  I mean, part of filing a

11:03:56  1    patent infringement suit and saying you're going to seek

11:04:01  2    injunctive relief is essentially that you want them to stop

11:04:04  3    selling to their customers.  And if that puts them out of

11:04:07  4    business, well, that's part of the patent infringement suit,

11:04:10  5    right?

11:04:11  6            MS. MORRISON:  I think that's right, Your Honor,

11:04:12  7    but that's not what's happening here.  They're not going --

11:04:16  8    this is not what we've alleged.  We are not alleging that

11:04:19  9    they are going to our customers and saying hi, we filed this

11:04:23 10    suit.  There might be consequences for you.  We're alleging

11:04:27 11    they've gone to our customers and said they have filed that

11:04:30 12    patent infringement suit, you should stop working with them

11:04:33 13    right now.

11:04:33 14            THE COURT:  That's not what it says.  It says on

11:04:35 15    information and belief, they contacted the customers and

11:04:38 16    referred to the patent suit, okay, and improperly sought to

11:04:42 17    induce, somehow, I don't know, LiveIntent's customers to

11:04:46 18    sever their commercial relationships.

11:04:47 19            Well, what I just said also is seeking to induce

11:04:52 20    someone which is to say yeah, I mean, we have this case and

11:04:56 21    I just want you to know if we win, we're going to seek an

11:04:59 22    injunction.  That's not an abuse of process.  Right?  And

11:05:02 23    that's really -- you're giving me nothing more specific than

11:05:07 24    that.

11:05:08 25            MS. MORRISON:  So perhaps, Your Honor, I should

11:05:11 1    go to our alternative form of a relief which would be to

11:05:15 2    allow us to replead this.  We can add additional detail.

11:05:19 3    I'm happy to make a proffer of some of that or Your Honor

11:05:22 4    could allow us to replead this with additional detail that I

11:05:25 5    think would address some of Your Honor's concern.  I am at

11:05:29 6    this point constrained by what we have in the complaint and

11:05:32 7    I don't want to go beyond --

11:05:33 8             THE COURT:  I appreciate you limiting yourself

11:05:35 9    to what is in the complaint.

11:05:37 10            MS. MORRISON:  I don't want to go beyond that.

11:05:38 11            THE COURT:  It is difficult when people bring in

11:05:40 12   new stuff that's not in the complaint, so I appreciate that.

11:05:44 13            So this is what I am going to do.  I am going to

11:05:47 14   grant the motion to dismiss, but I will do so without

11:05:51 15   prejudice.  And if you decide you want to try to amend,

11:05:55 16   follow my procedures for amending of the complaint, don't

11:05:58 17   simply file a new pleading that's going to trigger a motion.

11:06:01 18            But let me just say a few things about what I

11:06:04 19   think the shortcomings are that may help to guide you.

11:06:07 20   Okay?

11:06:08 21            So the elements that a plaintiff must prove in

11:06:11 22   an abuse of process claim in Delaware are one, an improper

11:06:15 23   or wrongful purpose in using legal process.  And two, a

11:06:19 24   willful act in the use of the system not proper in the

11:06:24 25   regular course of legal proceedings.

1    The second element requires alleging some form

2  of coercion to obtain a collateral advantage not properly

3  involved in the proceeding itself such as obtaining the

4  surrender of property or the payment of money by the use of

5  the process as a threat or club.  In other words, a form of

6  extortion is required.

7    Here, LiveIntent's counterclaim asserts upon

8  information and belief that AlmondNet used this litigation

9  to dissuade third parties from entering into and/or

10 conducting further business with LiveIntent, including by

11 contacting various LiveIntent customers, specifically

12 referring to this lawsuit and improperly seeking to induce

13 LiveIntent's customers to sever their commercial

14 relationship with LiveIntent and instead enter into a

15 commercial arrangement with AlmondNet.

16    LiveIntent further alleges that AlmondNet made

17 false and misleading statements to LiveIntent's customers

18 and raised the threat of litigation for the same purpose.

19    There are several shortcomings with those

20 allegations.  First, they lack detail that would be required

21 to put AlmondNet on notice of its conduct, particularly

22 considering that they key on a false and misleading

23 statement theory that generally sounds kind of like fraud.

24 LiveIntent does not state which of the customers were

25 affected, when the conduct began, what the misstatements

11:07:53 1    were, or even whether it has lost any business or suffered

11:07:55 2    any damages as a result.

11:07:56 3            Second, abuse of process which requires some

11:07:59 4    sort of extortion or coercion, as I said as I read the law

11:08:03 5    in Delaware, is not -- I just don't see that.  The

11:08:10 6    counterclaim does not allege that AlmondNet seeks any

11:08:14 7    concession from LiveIntent itself such as the repayment of a

11:08:18 8    debt, the surrender of a lucrative contact or negotiating

11:08:22 9    leverage to permit AlmondNet to acquire LiveIntent on unfair

11:08:26 10   commercial terms.  That was more like the *Nuance* and *MModal*

11:08:29 11   case.  That kind of conduct is the hallmark of abuse of

11:08:33 12   process.  Improper pressure asserted over the opposing party

11:08:38 13   to gain bargaining power over or directly benefit from it,

11:08:43 14   instead all of LiveIntent's claims describe AlmondNet's

11:08:46 15   conduct toward LiveIntent's customers.  That theory as I

11:08:50 16   said, it almost sounds to me like some kind of business tort

11:08:53 17   and not an abuse of process claim.

11:08:56 18           But in any event, those are my concerns with it.

11:09:02 19   I would just ask that you go back and think about what it

11:09:06 20   is, how you're making that out, and to the extent that you

11:09:09 21   want to rely on some of the cases that you cited from Judge

11:09:13 22   Burke, don't just focus on the facts that are the same, you

11:09:16 23   have to focus on all of the facts which include I think in

11:09:20 24   those cases having pleaded something more of a coercive

11:09:25 25   action.

11:09:26  1              Okay.  So that one I will grant, but do so

11:09:30  2    without prejudice.

11:09:32  3              All right.  Any other motions we have here

11:09:35  4    today?

11:09:36  5              MR. SCHEUFLER:  None from us, Your Honor.  But

11:09:39  6    we would ask that as this case will be going forward with

11:09:44  7    LiveIntent, whether they amend or not, we would ask that a

11:09:46  8    case management be scheduled so that we can begin the case.

11:09:53  9              THE COURT:  We'll ask that a schedule be -- that

11:09:56 10    you guys confer on a schedule.

11:09:58 11              MS. MORRISON:  Okay.

11:09:58 12              THE COURT:  And you can -- we'll send out an

11:10:00 13    order telling you to submit it in thirty days or so.

11:10:04 14              All right.  Anything else?

11:10:06 15              MS. MORRISON:  Nothing from our side, Your

11:10:09 16    Honor.

11:10:09 17              THE COURT:  All right.  Thank you.

11:10:11 18              COURT CLERK:  All rise.  Court is adjourned.

         19              (Court adjourned at 11:10 a.m.)

         20

         21         I hereby certify the foregoing is a true and
               accurate transcript from my stenographic notes in the proceeding.
         22

         23                      /s/ Dale C. Hawkins
                             Official Court Reporter
         24                     U.S. District Court

         25